A99A0119. THE STATE v. KWIATKOWSKI et al.
(519 SE2d 43)

ANDREWS, Judge.

Pursuant to OCGA § 5-7-1, the State appeals the trial court's order suppressing evidence of 27 pounds of marijuana found in appellees' car. For the following reasons, we affirm.

In reviewing a trial court's order granting a motion to suppress, we construe the evidence most favorably to uphold the court's ruling. *Mao v. State*, 222 Ga. App. 482, 483 (474 SE2d 679) (1996). It is the trial court's duty to resolve conflicts in the evidence, and its findings of fact and credibility will not be disturbed on appeal unless they are clearly erroneous. Id.

At about 4:17 p.m. on August 15, 1997, Barrow County Deputy Sheriff McDaniel noticed a black Toyota 4-Runner parked in a Department of Transportation parking lot just off Highway 211. Although Deputy McDaniel saw nothing to make him think the car had broken down or that its passengers were in distress, he went to investigate. The deputy drove up beside the car and spoke with the driver, Tanya Leonard, and the passenger, Chris Kwiatkowski (the

appellees). The deputy asked the appellees for identification and asked why they were parked in the DOT lot. The appellees, who were from Virginia, calmly explained that they were looking for Chateau Elan, that they missed their turn, and that they were lost. The deputy took the appellees' Virginia driver's licenses and parked his patrol car behind the appellees' car. He noticed that the car had a North Carolina tag. A check of Kwiatkowski's driver's license revealed that it had been suspended.

About three to five minutes later, Deputy Holcomb arrived and parked his patrol car next to Deputy McDaniel's car. Deputy McDaniel handed Deputy Holcomb the appellees' driver's licenses. Deputy Holcomb took the licenses and walked to the appellees' car. He asked Kwiatkowski if he had any illegal drugs, money, alcohol, or guns in the car and also asked for consent to search the car. Kwiatkowski said "no" to both questions. Deputy Holcomb said Kwiatkowski seemed somewhat nervous because he "would look away when he answered [the deputy's] questions." Deputy Holcomb did not give the appellees their driver's licenses or tell them that they were free to leave.

While Deputy Holcomb was questioning the appellees, a third deputy, Deputy Evans, arrived. Deputy Evans also asked the appellees for consent to search. For the second time, Kwiatkowski said "no." At 4:37 p.m., Deputy McDaniel radioed for a canine unit. Deputy McDaniel still had the appellees' licenses. There is no evidence that any of the deputies intended to or ever cited the appellees for any traffic offense. Nor did any deputy ever tell the appellees they were free to leave although, according to Deputy McDaniel, they were free to do so — "[a]ll they had to do was ask." Deputy McDaniel explained that he called for the drug dog because the appellees were parked in a DOT parking lot in a "high drug area" in an "out-of-state vehicle. At that one point they had done got nervous. You know, if you're not holding, you don't say no [to a request to search]. You don't care."

After Deputy McDaniel called for the drug dog, Deputy Evans returned the appellees' driver's licenses to them. He testified: "I remember I told [Kwiatkowski] the dog would be here in a few minutes, and we would cure the little problem of our suspicion and they would be ready to go." Fourteen minutes later, at 4:51 p.m., the canine unit arrived. The appellees were placed in the back of Deputy Holcomb's patrol car with the doors open. The drug dog alerted on the tailgate of the car. Deputy Evans found a large bag containing about 27 pounds of marijuana in a bag in the back of the car.

Although Deputy McDaniel's initial contact with the appellees can be characterized as a noncoercive, police-citizen inquiry, see *O'Donnell v. State*, 200 Ga. App. 829, 831 (1) (409 SE2d 579) (1991),

the situation rapidly matured into an investigative detention, a seizure within the meaning of the Fourth Amendment for which reasonable articulable suspicion of criminal activity is required. In this case, the appellees were detained without reasonable articulable suspicion while the canine unit was called. As we have explained:

> A person has been seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. In order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter.

(Punctuation omitted.) *McClain v. State,* 226 Ga. App. 714, 716 (1) (487 SE2d 471) (1997). A reasonable person would not have believed he was free to leave considering these circumstances: Three deputies and three patrol cars created an authoritative presence at the scene; the deputies kept the appellees' driver's licenses while they asked twice over a twenty-minute period whether any drugs were present in the car and whether they could search; the out-of-state appellees could not have left at that point without their driver's licenses; the appellees made it clear that they were not amenable to a consent search yet the deputies did not, at any time, inform the appellees that they were free to leave; and, when Deputy Evans finally did return the appellees' driver's licenses to them, he made a statement from which the appellees could reasonably infer that they were required to wait until after the drug dog arrived and "cured the little problem" of the deputies' suspicions. The appellees were "seized" within the meaning of the Fourth Amendment. See *United States v. Mendenhall,* 446 U. S. 544, 554 (100 SC 1870, 64 LE2d 497) (1980); *Rogers v. State,* 206 Ga. App. 654, 657-658 (1) (426 SE2d 209) (1992).

"An officer must have a reasonable and articulable suspicion that a person is involved in criminal activity to justify seizing that person for a brief period of time without probable cause to make an arrest." *State v. Stansbury,* 234 Ga. App. 281, 282 (505 SE2d 564) (1998). See also *Terry v. Ohio,* 392 U. S. 1 (88 SC 1868, 20 LE2d 889) (1968). The suspicion must be one that provides a "basis from which the court can determine that the detention was not arbitrary or harassing." *McFadden v. State,* 218 Ga. App. 327 (1) (461 SE2d 542) (1995).

Given the facts of this case, we cannot agree with the State that the officers possessed a reasonable and founded suspicion for detain-

ing the appellees while awaiting the drug dog. Stopping in a parking lot while lost, being from out-of-state, being in a car with a tag from another state — these are not factors which alone are sufficient to suggest criminal activity. Rather, they are frequent occurrences in our highly mobile society. Also, that appellees were parked in a high drug area does not alone constitute a justification for a brief detention. *Barnes v. State*, 228 Ga. App. 44, 46 (491 SE2d 116) (1997); *Rogers v. State*, supra at 659. Further, nervousness does not provide reasonable suspicion of criminal behavior as a matter of law. *Parker v. State*, 233 Ga. App. 616, 618 (1) (504 SE2d 774) (1998). Finally, Kwiatkowski's refusal to consent to a search of the car cannot constitute reasonable suspicion. See *Smith v. State*, 216 Ga. App. 453, 454-455 (2) (454 SE2d 635) (1995). The appellees were detained solely on Deputy McDaniel's hunch that drugs were in the car.

Because the deputies lacked reasonable articulable suspicion for detaining the appellees while the drug dog was called, the trial court properly granted the motion to suppress the marijuana evidence discovered as a result of the drug dog's alert.

*Judgment affirmed. McMurray, P. J., and Ruffin, J., concur.*

DECIDED JUNE 2, 1999.

*Timothy G. Madison, District Attorney, Robin R. Riggs, Assistant District Attorney*, for appellant.
*Hicks & Massey, William E. Hicks*, for appellees.